Carina A. Cuellar (Cal. Bar No. 244578)
  cuellarc@sec.gov
Lauren B. Poper (N.Y. Bar No. 2796704)
  poperl@sec.gov
Brittany K. Frassetto (N.Y. Bar No. 5119227)
  frassetob@sec.gov
100 F Street, NE
Washington, DC 20549
Telephone:  (202) 551-6414
Facsimile:  (202) 772-9292

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>NICHOLAS A. PALAZZO, 4TA SPORTS, INC.,<br>NP VENTURES HOLDINGS, LLC, and<br>PLAY CALLER SPORTS GAMING LLC,<br><br>                    Defendants. | Case No. 5:24-cv-6602<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY<br>TRIAL |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Nicholas A. Palazzo ("Palazzo"), 4TA Sports, Inc. ("4TA Sports"), NP Ventures Holdings, LLC ("NP Ventures"), and Play Caller Sports Gaming LLC ("Play Caller"), collectively "Defendants," alleges as follows:

### SUMMARY

1.       Nicholas Palazzo defrauded more than two dozen investors and stole their money through two investment schemes.  A former Harvard football player, Palazzo often targeted former teammates as his victims.  But he also misappropriated investments from others, including a Navy veteran and a senior care coordinator.  Palazzo promised his victims that their investments would be used to fund his sports-related businesses.  Instead, he spent the overwhelming majority of

investors' money on personal expenses such as rent for a multi-million-dollar home, private school tuition, jewelry, and a Disney vacation as well as on undisclosed debts, litigation fees, and other expenses unrelated to the business ventures for which he had solicited the investments.  In total, of the roughly $3.1 million Palazzo raised for two different purported business ventures, he spent approximately $2.6 million on himself and unrelated expenses.

2.    Palazzo is a 2003 graduate of Harvard University and a former football player.  To perpetrate his schemes, Palazzo used his collegiate relationships and sports connections to build trust while at the same time making materially false and misleading statements to investors about the businesses, including concerning third-party financing, the use of investor funds, and his compensation.  After obtaining money based on these false promises, Palazzo then spent nearly all of it on himself and unrelated expenses.

3.    From at least October 2019 to December 2023 (the "Relevant Period"), Palazzo and the sports-related corporate entities that he created and led—4TA Sports, Play Caller, and NP Ventures (together, the "Corporate Defendants")—fraudulently raised money from investors through securities offerings in which the investors received various forms of notes and warrants.

4.    During the Relevant Period, Palazzo raised investor funds in two separate schemes: the STACK Scheme; and the Play Caller Scheme.  In both schemes, Palazzo targeted specific individuals, convinced these individuals to invest through materially misleading statements, misappropriated their funds, and then subsequently approached new investors because he needed more investor money to continue to fund his lavish lifestyle and pay his debts.

5.    First, in the STACK Scheme, between at least October 2019 and March 2020, Palazzo raised $900,000 from three investors by offering and selling secured promissory notes and warrants through 4TA Sports.  During this offering, he represented to all three investors that their investments would be used to repurchase the assets of STACK Media, Inc. ("STACK").  STACK is a sports media company that Palazzo founded in 2005, largely sold in 2017, and was trying to then repurchase.  He further represented to all three investors that he either had or would shortly secure $5 million in third-party funding.  None of this was true.  Instead, shortly after receiving investor funds, he immediately spent the money to pay undisclosed debts, litigation fees, and personal

expenses, including his children's private school tuition and personal rent.  Also, Palazzo knew, or was reckless or negligent in not knowing, that he had not secured or would not shortly secure $5 million in third-party funding.

6.      Second, in the Play Caller Scheme, between at least September 2020 and December 2023, Palazzo raised approximately $2.1 million from at least 22 investors by offering and selling convertible promissory notes through Play Caller and its majority owner, NP Ventures.  Palazzo represented that investor funds would be used to develop and imminently launch the Play Caller sports-betting application.  Once again, this was not true.  Instead, Palazzo misappropriated more than 75 percent of investor funds to (a) pay personal expenses, including vacations to Disneyland and Hilton Head Island, South Carolina, (b) settle an unrelated lawsuit, and (c) pay himself exorbitant consulting fees.

7.      As a result of the alleged conduct, the Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Palazzo is also liable as a control person for the Corporate Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder pursuant to Section 20(a) of the Exchange Act.

8.      The SEC seeks a judgment from the Court, as set forth in more precise detail in the Prayer for Relief: (i) permanently enjoining the Defendants from violating Securities Act Section 17(a) [15 U.S.C. §77q(a)], and Exchange Act Section 10(b) [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (ii) permanently enjoining Palazzo, including through any entity owned or controlled by Palazzo, from participating in the issuance, purchase, offer, or sale of any security (other than securities for his own personal account); (iii) directing the Defendants to disgorge all ill-gotten gains they received as a result of the acts and/or courses of conduct complained of, plus prejudgment interest thereon; (iv) directing the Defendants to pay civil money penalties; (v) barring Palazzo from serving as an officer or director of a public company; and (vi) granting such other relief as this Court may determine to be just, equitable, and necessary.

**JURISDICTION AND VENUE**

9.      The Court has jurisdiction over this action under Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

10.      Defendants, directly or indirectly, used the means or instrumentalities of interstate commerce, or of the mails, in connection with the violations alleged in this Complaint.

11.      Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the Defendants' acts constituting the violations alleged herein, including making misrepresentations to investors and misappropriating their funds, occurred in this district.  Additionally, Defendant Palazzo resides in Santa Clara County, within this district, and each of the Corporate Defendants have their principal place of business in this district.

**INTRADISTRICT ASSIGNMENT**

12.      Under Civil Local Rule 3-2(c) and (e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions giving rise to the SEC's claims occurred in Santa Clara County and Defendant Palazzo resides within Santa Clara County.

**DEFENDANTS**

13.      **Nicholas A. Palazzo**, age 43, is a resident of Los Altos, California.  At all relevant times, Palazzo was the sole director and officer of 4TA Sports, Play Caller, and NP Ventures.  After graduating from Harvard, Palazzo remained in touch with some of his former Harvard football teammates and other former Harvard football players.  Palazzo generally presented himself as someone who worked in sports-oriented businesses, such as sports media companies.  During the fraud, as detailed below, Palazzo used approximately $2.6 million in investor funds for his personal expenses and other non-business expenses.

14.      **4TA Sports, Inc.** is a Delaware corporation formed on July 31, 2019.  4TA Sports' principal place of business is 228 Hamilton Ave., Floor 3, Palo Alto, California.  At all relevant times, Palazzo was the CEO and sole shareholder of 4TA Sports.  4TA Sports purported to be the entity through which Palazzo intended to repurchase STACK's assets from their new owner, SPay,

Inc. ("SPay").  From July 31, 2019 to the present, 4TA Sports has had no discernable source of income or revenue—virtually all of its funds appear to be investor funds.

15.     **NP Ventures Holdings, LLC** is a Delaware limited liability company formed on April 27, 2020.  NP Ventures' principal place of business is 228 Hamilton Ave., 3rd Floor, Palo Alto, California.  At all relevant times, Palazzo was the majority shareholder of NP Ventures and served as President, Chief Executive Officer, Secretary, and Treasurer.  NP Ventures was, in turn, at all relevant times the majority shareholder of Play Caller and other Palazzo-controlled sports ventures.  From April 27, 2020 to December 31, 2023, NP Ventures received approximately $150,000 in consulting income.  During that time, NP Ventures received more than $1 million in investor funds.

16.     **Play Caller Sports Gaming, LLC** is a Nevada limited liability company formed on May 22, 2020.  Play Caller's principal place of business is 228 Hamilton Ave., 3rd Floor, Palo Alto, California.  At all relevant times, Palazzo was the President, Chief Executive Officer, Secretary, and Treasurer of Play Caller, and through NP Ventures was also its controlling shareholder.  Play Caller purports to be in the business of micro-fantasy sports through a sports technology platform.  From May 22, 2020 to December 31, 2023, Play Caller had no significant source of income or revenue— virtually all of its funds appeared to be investor funds or funds from Palazzo or Palazzo-affiliated entities.

## RELEVANT PERSONS AND ENTITIES

17.     **STACK Media, Inc.,** incorporated in Delaware, was formed by Palazzo in 2005 to produce media and content for young athletes.  STACK's principal place of business was in California at the time Palazzo sold substantially all of STACK's assets to SPay in 2017.  Prior to the sale, Palazzo was the CEO and controlling shareholder of STACK.

18.     **SPay, Inc. d/b/a Stack Sports** is a Delaware corporation with a principal place of business in Plano, Texas.  SPay provides software and services for national governing bodies, youth sports leagues, clubs and associations, parents, coaches, and athletes.  SPay acquired substantially all of STACK's assets in 2017.

19.    **NP Vent LLC** is a California limited liability company formed on April 6, 2011. NP Vent's principal place of business is 228 Hamilton Ave., 3rd Floor, Palo Alto, California.  At all relevant times, Palazzo was the sole shareholder of NP Vent, which was his consulting company. NP Vent is a different entity than NP Ventures.  Palazzo primarily used NP Vent's bank account to pay personal expenses.

20.    **Entity A** is a private digital marketing company based in Toronto, Ontario, Canada. Entity A ceased operations in April 2019 and went into receivership by order of the Ontario Superior Court of Justice.  Entity A was STACK's largest customer.

21.    **Marketing Firm B** is incorporated in Texas, with a principal place of business in Dallas, Texas.  Individual E co-founded Marketing Firm B in 2015 to provide sports marketing and management services.

22.    **Consulting Company C** is incorporated in Texas, with a principal place of business in Gilmer, Texas.  Individual E founded Consulting Company C in 2014 to raise money for a charitable program associated with high school football players.  Individual E currently uses Consulting Company C to hold his consulting business.

23.    **Media Company D** is incorporated in New York, with a principal place of business in Smithtown, New York.  Media Company D purports to be engaged in international feature film development, production, and the use of media rights.

24.    **Individual E** is a resident of Gilmer, Texas.  Individual E is the founder and owner of Consulting Company C, his consulting business, and a founder and 50% owner of Marketing Firm B, a sports marketing and management business.  Individual E and Palazzo are longtime friends and business associates.

## FACTUAL ALLEGATIONS

### A.    Palazzo's Past Lawsuits and Business Problems Motivated His Fraud.

25.    One of Palazzo's key motivations for perpetrating two fraudulent schemes and misappropriating millions of dollars in investor funds were the lawsuits against him and associated legal and settlement expenses that he incurred.  As outlined below, these difficulties are relevant because they demonstrate Palazzo's motive and scienter in connection with the fraudulent schemes.

Indeed, from 2015 through 2020, Palazzo accumulated a significant amount of debt related to several businesses, was involved in several lawsuits, and was terminated from his job. Palazzo raised funds from investors by telling them it was for business purposes; however, he used a significant amount of the investor funds to pay the debts and expenses described below.

26. In 2005, Palazzo founded STACK, a youth sports media company. Over time, STACK had a number of investors and creditors that it owed money to. By May 2017, STACK had more than $18.6 million in outstanding liabilities.

27. In mid-2017, Palazzo sold substantially all of STACK's assets to SPay for $9.5 million. After selling STACK, Palazzo joined SPay as its Chief Digital Officer. During this time, Palazzo faced mounting difficulties because he failed to fully repay some of STACK's investors and creditors and also concealed from SPay some of STACK's liabilities, as set forth below:

   a. Between 2017 and 2019, and while he was still employed as SPay's Chief Digital Officer, Palazzo failed to fully repay all of STACK's investors and creditors after the SPay sale, resulting in at least two lawsuits by STACK investors against Palazzo and his companies for fraud and breach of contract.

   b. Palazzo also concealed from SPay the extent of STACK's debts to Entity A. Entity A was STACK's largest customer and their substantial monetary relationship required both STACK and Entity A to make payments to and receive payments from each other. Subsequently, Entity A went into receivership in April 2019. Then, from approximately June 2019 to early November 2019, Palazzo concealed from SPay the fact that Entity A's receiver was demanding money from SPay. Indeed, until early November 2019, SPay's understanding was that Entity A owed STACK millions of dollars. Palazzo admitted in testimony during the SEC's investigation of these events that he attempted to resolve these demands by wiring $250,000 to Entity A's receiver in October 2019 without SPay's knowledge. Then, in November 2019, Entity A's receiver contacted SPay directly, claiming that SPay owed Entity A more than $4 million. SPay terminated Palazzo's employment in April 2020. And in July

2020, SPay subsequently sued Palazzo and other STACK executives for concealing the nature of Entity A's relationship and misappropriating SPay's funds.

c.  Additionally, in 2015, Palazzo, on behalf of STACK, entered into an agreement with Marketing Firm B, a sports management company, whereby STACK would solicit sponsorships and advertising for Marketing Firm B.  Under the agreement, STACK received a $300,000 advance and was required to generate a minimum of $600,000 in revenue.  According to Individual E, one of Marketing Firm B's owners, STACK did not generate the required revenue and was required to repay the advance, plus the revenue shortfall.  Palazzo testified that he made repayments to Marketing Firm B at least through 2019 and 2020.  SPay was not aware of this agreement or debt.

28.    Separately, by on or around October 4, 2019, Palazzo and a Palazzo-controlled entity were sued for fraud, breach of contract, and other legal violations related to a $1 million transaction that occurred in July 2019.  This lawsuit (the "2019 Civil Lawsuit") was unrelated to SPay or the Corporate Defendants.

**B.    Palazzo and 4TA Sports Fraudulently Raised at Least $900,000 from Investors by Misrepresenting that the Funds Would be Used to Repurchase STACK.**

**1.    Overview of the STACK Scheme.**

29.    By 2019, Palazzo became unhappy with his 2017 sale of STACK and began negotiating with SPay to repurchase some of STACK's assets.  (Palazzo often referred to repurchasing STACK's assets as simply repurchasing STACK, and for simplicity this Complaint refers to it the same way.)  Palazzo formed 4TA Sports to serve as the company that would repurchase STACK and is the sole shareholder of 4TA Sports.

30.    Between October 2019 and March 2020, Palazzo and 4TA Sports raised at least $900,000 from three investors for the STACK repurchase.  Palazzo first approached two former Harvard football teammates ("Investor 1" and "Investor 2") in October 2019.  He explained to each of them that he would use their investment to repurchase STACK.  He convinced both to invest after representing that he had already secured a $5 million funding commitment and presenting a purported funding agreement signed by Individual E on behalf of Consulting Company C.  The

funding agreement purported that 4TA Sports promised to pay Consulting Company C $5 million with interest "for value received."  Palazzo further represented that Consulting Company C was a "family office," a term used to refer to a private wealth management office established by an ultra-high-net worth family, which lent an air of credibility, sophistication, and security to the investment.  Palazzo's statements to Investors 1 and 2 were false.  Not only had Palazzo not secured $5 million in funding, but also, shortly after receiving $250,000 from each investor, Palazzo began using the money on debts and legal and personal expenses unrelated to the repurchase of STACK.

31.    After Palazzo had misappropriated almost all the $500,000 from Investors 1 and 2, he sought out a new victim.  In and around March 2020, he spoke with his next victim ("Investor 3"), who owned a youth sports training center.  He convinced Investor 3 to invest $400,000, again claiming he had secured a $5 million funding commitment and presenting a different purported $5 million funding agreement between 4TA Sports and Media Company D.  The funding agreement purported that 4TA Sports would receive $5 million in funding in March 2020.  Palazzo also assured Investor 3 that her funds would be used to repurchase STACK.  None of this was true.  Indeed, shortly after receiving Investor 3's funds, Palazzo used the funds for personal expenses and for legal debts and fees unrelated to repurchasing STACK.

32.    Palazzo never used investor funds for expenses associated with an attempt to repurchase STACK.  To the contrary, Palazzo used at least 90% of the funds on unrelated debts and litigation expenses, as well as personal expenses such as private school tuition and vacations.  Ultimately, Palazzo never repurchased STACK.  The specific details of Palazzo's STACK Scheme are described below.

**2.    Palazzo and 4TA Sports Defrauded Two Former Harvard Football Players Through a Securities Offering.**

33.    In October 2019, Palazzo reached out to Investors 1 and 2 seeking $250,000 from each of them.  He explained to both investors that he intended to use their funds for the repurchase of STACK.

### a. Investor 1

34.    During the investment process, Palazzo both spoke with his friend and former teammate Investor 1 and sent him emails.  Palazzo, as 4TA Sports' sole officer, proposed an investment opportunity to his friend.  In return for Investor 1 committing $250,000, 4TA Sports and Palazzo offered to provide Investor 1 with the following: (1) a $250,000 secured promissory note with a maturity date just two weeks after the deal (October 31, 2019) with a 6% interest rate and a preferred return of 10% ($25k), (2) a warrant to purchase to 62,500 shares in 4TA Sports at $.01, (3) a security agreement granting Investor 1 a security interest in and lien on 4TA Sports' assets, and (4) a pledge agreement granting Investor 1 a first priority security interest in all of Palazzo's 4TA Sports stock.

35.    In an October 10, 2019 email to Investor 1, Palazzo explained that he was at the "finish line" in his repurchase of STACK.  He further explained that he was "about $250k short in the interim for these working capital true-ups, which I hadn't planned to address until post-closing as is the traditional treatment."  In this same email, Palazzo claimed that "I have the full financing committed ($5m) by a family office in Texas who is also an investor in [Redacted], which is one of the top trainers in the nation and an original advisory board member of Stack."  In response to this email, Investor 1 expressed that he would like to help, but that he wanted to speak, in part, to understand the risk associated with the investment.  In a follow-up email, Palazzo then provided Investor 1 a copy of a convertible promissory note between 4TA Sports and Consulting Company C (the purported family office), dated September 23, 2019, which supposedly documented Consulting Company C's agreement to provide $5 million to 4TA Sports.

36.    After speaking with Palazzo and accepting his representations, Investor 1 signed the warrant agreement and security agreement.  Palazzo executed these same documents, as well as the promissory note and pledge agreement, as the Chairman of 4TA Sports.  After receiving instructions from Palazzo, Investor 1 then wired $250,000 on October 15, 2019, to a bank account associated with one of Palazzo's other entities.

### b. *Investor 2*

37.     During this same period, Palazzo also reached out to Investor 2 to secure $250,000 in funds, again offering a promissory note, 4TA Sports warrants, a security agreement, and a pledge agreement in return.  In emails dated between October 10 and 11, 2019, Palazzo presented Investor 2 with the same deal terms proposed to Investor 1.  Palazzo represented that the funds would be used to "clean up some of the working capital from the acquisition from 2017 to now and for me to repay approximately $250k of capital that they funded into Stack before the deal closes."  Palazzo further represented that: "I have the financing and deal documentation completed to close on the acquisition of the Stack assets as soon as the family office can fund, which is expected to be next week, but could possibly slip into the following week."  In response to questions from Investor 2, Palazzo doubled down and stated the "family office is fully committed" and "they have committed to fund me with the $5m regardless as to if I buy the Stack assets back."  Palazzo also provided a copy of a convertible promissory note between 4TA Sports and Consulting Company C, dated September 23, 2019, which supposedly documented Consulting Company C's agreement to provide $5 million to 4TA Sports.

38.     After Palazzo's representations to Investor 2, Investor 2 signed the security agreement and warrant agreement on October 11, 2019.  Palazzo executed these same documents, as well as the promissory note and pledge agreement, as the Chairman of 4TA Sports.  Investor 2 then wired $250,000 on October 15, 2019 to a 4TA Sports bank account.

39.     Palazzo's transactions with Investors 1 and 2 constituted an offer and sale of securities.  Indeed, the warrants on their face warn the holder, in part, that they are securities subject to certain transfer restrictions under the federal securities laws.  Additionally, the secured promissory notes were interest-bearing notes that are defined as securities under the federal securities laws, and further operate as securities because (1) 4TA Sports and Palazzo were motivated to use the funds to finance a substantial investment, (2) a reasonable investor would have been motived by the profit generated, including the 6% return, (3) a reasonable member of the investing public would have considered the secured promissory notes securities, and (4) no risk-reducing factor, such as an alternative regulatory regime, would make application of the securities

laws unnecessary.  Alternatively, the warrants and notes constitute an investment contract in which Investors 1 and 2 invested money and expected to receive profits from Palazzo's efforts in connection with 4TA Sports and STACK.

### c.  *Palazzo's Statements to Investors 1 and 2 Were False.*

40.    Palazzo and 4TA Sports' statements to Investors 1 and 2 concerning the use of investor funds and the $5 million in secured funding were materially false and misleading.  Palazzo had no intention of using the funds to "clean up" working capital or otherwise fund the STACK acquisition.  Palazzo also knew, or was reckless or negligent in not knowing, that he (1) had not secured $5 million in funds for the STACK repurchase and (2) as presented, the $5 million promissory note was misleading.

41.    First, as stated above, both investors wired $250,000 to Palazzo-controlled bank accounts on October 15, 2019, after Palazzo represented that the funds would be used for "working capital" issues related to the STACK repurchase.  However, that very same day, Palazzo wired the $250,000 he received from Investor 1 to try to resolve the demand from Entity A's receiver.  This payment had nothing to do with "working capital true-ups" or repurchasing STACK.  To the contrary, at that time SPay had no knowledge of any possible debt owed by STACK to Entity A, nor had Palazzo informed SPay of any negotiations with or payments made to Entity A's receiver.  Thus, Palazzo did not use Investor 1's funds to secure the STACK repurchase.

42.    Then, between October 18, 2019 and February 27, 2020, Palazzo used approximately $95,000 from Investor 2 to repay debts owed to Marketing Firm B, which are expenses that predate SPay's acquisition of STACK, and were unknown to SPay.  Thus, there is no legitimate reason why Palazzo needed to make this payment prior to closing on the STACK repurchase.  Palazzo then spent another approximately $25,000 from Investor 2 to pay his lawyers in the 2019 Civil Lawsuit.  Palazzo then transferred approximately $130,000 of Investor 2's funds to a Palazzo-controlled bank account held in the name of NP Vent LLC ("NP Vent"), an account he primarily uses for personal expenses.  For example, Palazzo transferred $9,000 of Investor 2's funds to NP Vent on or around November 5, 2019, and then immediately used these funds to pay his personal rent.

43.     Palazzo's immediate misappropriation of investor funds demonstrates that he had no intention of using the investments to pursue the STACK repurchase.  Further, Palazzo's statements that he would use the funds to repurchase STACK were materially misleading because a reasonable investor would have wanted to know that Palazzo intended to use investor funds for debts, litigation, and personal expenses, rather than the stated business purpose.  Indeed, Investor 1 has stated that his funds being used to stave off litigation would have been important information for him to know when deciding to invest because he would have considered the investment riskier.  He further stated that he would have been unlikely to invest had he known that his funds would be used for this purpose.

44.     Second, Palazzo knew, or was reckless or negligent in not knowing, that he and 4TA Sports had not secured $5 million in financing for the STACK repurchase.  Palazzo represented to Investors 1 and 2 that the $5 million was "committed" by a "family office," which Investor 1 understood to mean a privately held wealth management firm of a high-net-worth family or group of individuals.  Palazzo then sent each investor a copy of a $5 million promissory note between 4TA Sports and Consulting Company C.  Taken together, Palazzo's representations about the $5 million funding commitment from Consulting Company C portrayed the investment to Investor 1 as something that was sophisticated, had attracted interest from high-net-worth individuals, and was secured by funds from those high-net-worth individuals.  In truth it was anything but.

45.     For example, Palazzo knew that Consulting Company C was not a family office but rather a consulting business run by Individual E, and Palazzo also knew or was reckless or negligent in not knowing that Consulting Company C lacked any realistic ability to provide $5 million in funding.  For example, Palazzo knew that Consulting Company C was not even providing this funding; at best the funding (if it ever came at all) would come from another source or sources (potentially Media Company D) and would be routed through Consulting Company C.  Palazzo also knew that those other sources had not yet provided any of those funds to Consulting Company C. And Palazzo also knew that one of those potential funding sources, Media Company D, was the same source Palazzo had been trying (and failing) to get funding from for about a month.  Palazzo also knew that Individual E, the signatory on the $5 million promissory note, had separately been

trying (and failing) for several months to help Palazzo raise $1 million to help resolve the claims that resulted in the 2019 Civil Lawsuit, in which both he and Individual E were defendants.  Taken together, Palazzo knew, or was reckless or negligent in not knowing, that his written and oral representations to Investors 1 and 2 that he had the $5 million in financing and that it was fully committed, as represented by the $5 million promissory note, were misleading.  Further, these statements were materially misleading because a reasonable investor would have wanted to know that guaranteed funding had not been secured because it rendered their investment riskier.  Indeed, Investor 1 indicated that the existence of $5 million in committed financing was important to his assessment of the riskiness of the investment.

46.     At a minimum, Palazzo misled Investors 1 and 2 by representing that he had $5 million in funding while omitting information necessary to make that statement not misleading, including that the funders of Consulting Company C had not yet provided the funds.

### d. Palazzo's Deceptive "Lulling" Statements to Investor 1.

47.     Both Investors 1 and 2 were to be repaid with interest on October 31, 2019, a mere two weeks after providing the funds.  Knowing he would not repay the investors on time (because he had already stolen most of the investors' money), Palazzo began engaging in "lulling" statements to Investor 1 a day before repayment was due, when he assured Investor 1 that he was "definitely closing everything this week."  Then, on or around November 11, 2019, Palazzo told Investor 1: "All signs point to this week getting the funds back to you."  On or around December 24, 2019, Palazzo told Investor 1: "Expecting to close on or before 12/31."  On or around February 12, 2020, Palazzo told Investor 1: "I expect that we'll close things out by the end of the month and be able to do the payback soon after."  Approximately three months later, on or around May 29, 2020, Palazzo told Investor 1: "Funds are supposed to be here on Monday and then closing."  Then, on or around June 16, 2020, Palazzo told Investor 1: "No funds yet but they are promising by end of this week."  Finally, approximately 10 months after Investor 1's $250,000 wire, on or around August 28, 2020, Palazzo told Investor 1: "I expect some real movement/negotiation on the deal to happen in the next week or so."

48.     Investor 1, who was concerned, also asked Palazzo for updates on several occasions. On or around November 15, 2019, Investor 1 asked Palazzo if there was "any risk of running out of $$ while you are working to close." Palazzo responded: "Hey, no risk there, all good on the cash flow at the moment." Then, on or around January 13, 2020, Investor 1 asked Palazzo: "Is cash flow okay in the meantime?" Palazzo responded: "Cash flow is good right now so no worries there."

49.     Palazzo knew all of these lulling statements were false because he had already sent Investor 1's funds to Entity A's receiver. He therefore knew that he had no intention of using the money to close the deal with STACK.

50.     These lulling statements were designed to prevent Investor 1 from taking any action to report Palazzo's conduct, which enabled Palazzo to continue defrauding other investors in both the STACK and Play Caller Schemes.

51.     To this date, Palazzo has not repurchased STACK. Palazzo has also not repaid Investors 1 and 2 any of the principal or interest due on their promissory notes.

**3.     Palazzo Defrauded the Owner of a Youth Sports Training Center.**

52.     After misappropriating almost all of Investor 1 and 2's funds, Palazzo pitched the STACK investment to his next victim ("Investor 3") via telephone in and around March 2020. Palazzo was introduced to Investor 3 through Individual E, who had a mutual connection in the sports industry. During this period, Investor 3 and her family were in the process of building a youth sports training center.

53.     After being introduced, Palazzo made materially misleading statements to Investor 3 like those made to Investors 1 and 2 to secure an investment. During these discussions, Individual E both arranged and was present for phone calls between Investor 3 and Palazzo and forwarded emails from Palazzo to Investor 3. In these discussions, Palazzo explained to Investor 3 that he was attempting to repurchase STACK and that he needed to come up with a down payment and the remaining funds to finalize the repurchase. He also explained that Investor 3's $400,000 investment would act as a "bridge loan" until he shortly received the $5 million in funding that Media Company D had already committed to provide. Palazzo assured Investor 3 that her investment would be secured by a $5 million credit placement agreement that 4TA Sports had with Media

Company D.  During these same discussions, Palazzo also pitched that STACK would use and promote her training center with professional athletes.

54.     According to Investor 3, she came away from her discussions with Palazzo understanding that her money would be used to repurchase STACK, her investment would be secured by the credit placement agreement, and STACK would promote her training center.  Based on this understanding, Investor 3 agreed to make the investment.  Palazzo subsequently signed a promissory note memorializing the investment, which he asked Individual E to send to Investor 3.

55.     Investor 3's understanding is confirmed by the deal documentation, which Palazzo signed as 4TA Sports' Chairman and CEO.  The investment package provided to Investor 3 included a promissory note and a $5 million credit placement agreement from Media Company D, which purported to secure the investment.  Under the terms of the promissory note, Investor 3 was entitled to 5% interest on her investment.  The principal and interest on the note were to be paid approximately one month later on April 3, 2020.  The credit placement agreement was between Media Company D and 4TA Sports, signed by Palazzo as the Chairman and CEO and dated January 6, 2020.  The version of the agreement sent to Investor 3 stated that Media Company D's funds would be delivered in March 2020.

56.     After accepting Palazzo's representations, Investor 3 ultimately wired $400,000 to a 4TA Sports bank account on and around March 6, 2020.

57.     Like the promissory notes and Warrant Agreements 4TA Sports entered into with Investors 1 and 2, this promissory note is a security, either in the form of a note or an investment contract.

### a. *Palazzo Intentionally Deceived Investor 3.*

58.     Palazzo and 4TA Sports' statements to Investor 3 concerning the use of her funds and the $5 million in secured funding were materially false and misleading.  Palazzo had no intention of using the funds to repurchase STACK.  Further, Palazzo knew, or was reckless or negligent in not knowing, that (1) he had not secured $5 million in funds for the STACK repurchase and (2) as presented, the $5 million credit placement agreement was misleading.

59.     Palazzo never intended to use Investor 3's funds to repurchase STACK.  As stated above, Investor 3 wired the $400,000 on March 6, 2020, believing the funds would be used for the STACK repurchase.  However, that very same day, Palazzo began a series of transfers that eventually totaled $68,000 to the NP Vent Account, which he primarily used for personal expenses. Moreover, beginning that very same day and continuing into later that month, Palazzo wired a total of $75,000 he received from Investor 3 to repay his debt to Marketing Firm B.  Palazzo also wired $15,000 to pay his lawyers in the 2019 Civil Lawsuit.  Palazzo's use of Investor 3's funds for personal expenses, legal expenses, and an unrelated lawsuit are misappropriation.

60.     Then, on April 8—after Investor 3's promissory note was due for payment—Palazzo wired $180,000 through three STACK bank accounts that he controlled before ultimately wiring the money to SPay on the same day.  Palazzo testified that this payment was a necessary part of the repurchase process.  But, according to an SPay representative, SPay's controller periodically asked if Palazzo's STACK unit was generating cash and, if so, to direct it to be sent to the parent company.  Moreover, SPay described the purpose of this $180,000 payment in a balance sheet entry as "a net cash payment and reduce Old Stack receivable."  Thus, Palazzo sent this payment to SPay pursuant to STACK's normal operating agreements and to lead SPay to believe that STACK was generating cash.  Further, during this period, SPay and Palazzo were not in active negotiations because SPay had paused the negotiations to investigate Palazzo's knowledge of STACK's purported debts to Entity A.  And, indeed, SPay fired Palazzo two days after this payment transfer. Thus, this payment had nothing to do with repurchasing STACK.

61.     Palazzo's immediate misappropriation of Investor 3's funds shows that he never had any intention of using her investment to pursue the STACK repurchase.  Further, his statements were materially misleading because a reasonable investor would have wanted to know that Palazzo intended to use investor funds for STACK's debts and Palazzo's personal and legal expenses; rather than, the stated business purpose.  Indeed, Investor 3 has stated that she would not have invested if she knew that Palazzo was going to use the funds for personal expenses.

62.     Moreover, Palazzo's misappropriation here comes after he had already misappropriated nearly $500,000 raised from other investors.  His previous misappropriation of

Investor 1 and 2's funds further demonstrates that at the time he solicited funds from Investor 3, he did so knowing that he planned to use the funds for his personal benefit and not to advance the STACK repurchase.

63.     Palazzo knew, or was reckless or negligent in not knowing, that he and 4TA Sports had provided a credit placement agreement to Investor 3, which would never be funded.  According to the agreement, 4TA Sports was supposed to receive the $5 million from Media Company D in March 2020.  In reality, Palazzo had entered into an identical credit placement agreement with Media Company D in September 2019 and was supposed to receive the funds that month.  Media Company D never provided the funds.  Yet, after months of not receiving the $5 million, Palazzo asked Media Company D's managing director to sign a new agreement in January 2020, stating: "I can't show the old agreement to my funding source. I need something recent."  Palazzo asked the managing director to sign yet another new version in in late February 2020 and a follow-up letter in early March, prompting Palazzo to send an email stating: "Hopefully this helps us get something closed!"  These emails demonstrate that Palazzo knew, or was reckless or negligent in not knowing, that the $5 million credit placement agreement was simply a ruse to obtain money from Investor 3, and that there was never any true intention of the credit placement agreement actually funding.  Indeed, the credit placement agreement that Palazzo provided to Investor 3 never funded.

64.     Taken together, Palazzo knew that his representations to Investor 3 about the $5 million credit placement agreement were false.  Further, these statements were materially misleading because a reasonable investor would have wanted to know that the collateral for the promissory note had not been secured because it rendered their investment riskier.  Indeed, Investor 3 has stated that she ultimately invested because the credit placement agreement convinced her that her investment was safe.

65.     Palazzo has not repaid Investor 3 any of the principal or interest due on her promissory note.  When contacted by Investor 3, Palazzo continues to claim that he does not have the funds to repay her.  Palazzo has never informed Investor 3 that he spent her investment on debts and personal and legal expenses.

COMPLAINT                                      18

### 4. Palazzo Misappropriated Investor Funds.

66. As described above, between October 2019 and March 2020, Palazzo received $900,000 to repurchase STACK through promissory notes between 4TA Sports and Investors 1, 2, and 3. During this same period, 4TA Sports had no source of funds other than this $900,000. Palazzo misappropriated nearly all $900,000, using the funds for prior debts, transfers to the NP Vent Account, and litigation expenses unrelated to Palazzo's efforts to repurchase STACK. The below chart breaks down the specific use of the investor funds.

| Category | Amount | Percentage |
|---|---|---|
| Entity A settlement and payments | $265,000 | 29.4% |
| Transfers to NP Vent subsequently used for personal expenses | $170,386.30 | 18.9% |
| Transfers to NP Vent subsequently used for unrelated debts and litigation expenses | $10,500 | 1.2% |
| Payments to Marketing Firm B | $170,000 | 18.9% |
| Legal Fees for the 2019 Civil Lawsuit | $55,000 | 6.1% |
| Payments to SPay | $180,000 | 20.0% |
| Other STACK Debts | $29,522 | 3.3% |
| *Subtotal of improperly used funds* | *$880,408.30* | *97.8%* |
| Business expenses | $0 | 0.0% |
| Transfers to NP Vent subsequently used for potential business expenses | $5,574.92 | 0.6% |
| Transfers to NP Vent subsequently used for other expenses | $12,641.02 | 1.4% |
| Other expenses | $826 | 0.1% |
| *Subtotal of funds not presently alleged to be improperly used* | *$19,041.94* | *2.1%* |
| **Total** | **$899,598** | |

67. Because he was the person both making the statements above and misappropriating investor funds, Palazzo knew, or was reckless or negligent in not knowing, that his statements to investors were materially false and misleading. He also knew, or was reckless or negligent in not knowing, that his misappropriation of funds acted, or would act, as a fraud or deceit upon these same investors. Because Palazzo was the CEO and sole shareholder of 4TA Sports and acted on behalf of 4TA Sports when signing the notes and investment contracts discussed above, his scienter and negligence imputes to 4TA Sports. Additionally, because Palazzo managed 4TA Sports on a day-to-day basis, negotiated the notes and investment contracts at issue, and controlled the financial

expenditures for 4TA Sports throughout this period, he is a control person of 4TA Sports within the meaning of Section 20(a) of the Exchange Act.

68.    The SEC has recently received information that, within the past three months, Palazzo may have re-victimized Investors 2 and 3 by inducing them to sign amendments to the promissory notes described above that supposedly convert the funds owed to the investors into equity in yet another Palazzo business venture.  Investor 1 received a similar solicitation from Palazzo but has not signed an amendment to his agreements with Palazzo and 4TA Sports.  When soliciting Investor 1 to sign these amendments, Palazzo omitted any reference to how he had previously used Investor 1's funds.  That omission rendered materially misleading statements that Palazzo made to Investor 1 in the new solicitation, including that the new business was "an opportunity to reorganize and amend your current outstanding 4TA Sports Note to facilitate repayment and provide appropriate collateral."  Based on the documents the SEC has presently obtained regarding the solicitations of Investors 2 and 3, it appears that Palazzo similarly omitted his misappropriation of funds when recently soliciting them, which rendered similar statements to them materially misleading.  The SEC is continuing to assess these new developments.  However, Palazzo's misleading efforts to have investors sign amendments to their prior agreements, including representations that these amendments are a way for investors to obtain repayment, are part of his scheme to conceal from them his intentional misappropriation of their funds.

**C.    Palazzo, NP Ventures, and Play Caller Fraudulently Raised Approximately $2.1 Million from Investors by Misrepresenting that the Investments Would Fund the Development of a Sports Betting Application.**

**1.    Overview of the Play Caller Scheme.**

69.    With the ink barely dry on Investor 3's promissory note, Palazzo pivoted and formed NP Ventures in April 2020 and Play Caller in May 2020.  Palazzo testified that NP Ventures is an operating company that supports new companies created by him, including Play Caller.  At all relevant times, Palazzo was the CEO and majority shareholder of NP Ventures; NP Ventures was the majority shareholder of Play Caller; and Palazzo served as CEO of Play Caller.  Play Caller

purports to be a technology company focused on sports betting, fantasy sports, gaming, and providing data and fan engagement experiences.

70.    After forming NP Ventures and Play Caller, Palazzo commenced the Play Caller Scheme in September 2020.  From September 2020 until December 2023, Palazzo raised more than $2.1 million from at least 22 investors through Play Caller and NP Ventures, representing that investor funds would be used to develop and launch the Play Caller mobile application through which players could bet on the next play in a live sports game (the "Play Caller App").  Instead, however, Palazzo misappropriated more than 75 percent of these investor funds to pay undisclosed debts, litigation fees, personal expenses, including vacations to Disneyland and Hilton Head Island, South Carolina, and consulting fees to himself.

71.    The $2.1 million raised consisted of approximately $1 million in NP Ventures investments from 5 investors and approximately $1.1 million in Play Caller investments from approximately 17 investors.  All but one investor's investments were memorialized in convertible promissory notes with NP Ventures or Play Caller.  One convertible promissory note purported to pay 15% interest; the rest purported to pay 6% interest.

72.    The Play Caller and NP Ventures convertible promissory notes are securities. Indeed, most of the notes discussed below state on their face that they are securities subject to certain transfer restrictions under the federal securities laws.  Additionally, they are interest-bearing and can convert into equity securities.  Alternatively, they are also investment contracts under which each similarly-situated victim invested money (which was then pooled together) with the expectation of profits from Palazzo's efforts.

**2.    Palazzo Misappropriated Investor Money.**

73.    Palazzo, through NP Ventures and Play Caller, approached at least 22 investors.  In many instances, Palazzo emailed and often spoke with investors using pitch decks that he drafted. Palazzo represented to each investor discussed below that their investment would be used to develop the Play Caller App.  However, in each instance, Palazzo misappropriated the overwhelming majority of funds for his personal use.  His specific materially misleading statements

concerning how investor funds would be used and his subsequent misappropriation of funds are detailed below.

### a. *Palazzo and Play Caller Defrauded a Group of Eight Investors—Twice.*

#### i. *The First Fraudulent Offering to the Dallas Investor Group.*

74.     On or around November 11, 2020, Palazzo pitched a group of eight Dallas-area investors (the "Dallas Investor Group") on a Play Caller investment through an in-person meeting and presentation.  According to a member of the Dallas Investor Group ("Investor 4"), Palazzo represented to the group that their investment funds would be used to pay software engineers working on the Play Caller App.  He also represented that the Play Caller App would be launching in January 2021, just in time for the NFL playoffs.

75.     Further, Palazzo's presentation included a slide titled "Use of Funds."  That slide stated that a $500,000 investment would allow Play Caller to (1) "Secure key data, engineering and management talent"; (2) "Execute against [strategic distribution] partnership to bring API to sportsbook market"; and (3) "Develop first 'Free to Play' Game in partnership with major telecommunications partner/s."  Palazzo also represented that his salary would be limited to $20,833 per month and sent a spreadsheet indicating that his salary would represent a relatively small portion of Play Caller's overall expenses.

76.     After this meeting, in December 2020, the members of the Dallas Investor Group collectively invested $500,000 in the Play Caller offering.  Each investor's investment was memorialized in a convertible promissory note with Play Caller and had a maturity date of December 28, 2022.

77.     After obtaining the Dallas Investor Group's funds in December 2020, Palazzo wasted no time in putting them to his personal use.  Indeed, that month, Palazzo used approximately $19,000 of the funds to pay legal fees related to the 2019 Civil Lawsuit.  Then, in January 2021, Palazzo spent $235,000 of the $500,000 investment to settle the 2019 Civil Lawsuit.  Further, between December 2020 and March 2021, Palazzo spent approximately $54,000 to repay part of his outstanding debt to Marketing Firm B.  Palazzo also used approximately $21,000 of the Dallas Investor Group's funds to pay a company that removes negative information from individuals'

online search results.  Additionally, Palazzo transferred at least $37,000 of funds from the Dallas Investor Group to the NP Vent Account, which he primarily used for personal expenses.  Palazzo had exhausted the entire $500,000 investment by around April 6, 2021.  In total, Palazzo and Play Caller spent less than ten percent of the Dallas Investor Group's funds on Play Caller's software engineers and other development personnel.

78.     Thus, despite Palazzo's representations that his salary would represent a relatively small portion of Play Caller's overall expenses, he subsequently spent approximately 80% of the Dallas Investor Group's funds for his personal use, as shown in the chart below.  During the period from December 2020 through March 2021, Play Caller had no source of funds other than the $500,000 from the Dallas Investment Group.  For purposes of this chart, "personal use" includes the consulting fees that operated as Palazzo's salary, other personal expenses, and debts and litigation expenses unrelated to Play Caller.

| Month | Disclosed Salary | Disclosed Salary as % of Planned Expenses | Total Funds Actually Spent | Amount Spent on Personal Use | % Spent on Personal Use |
|---|---|---|---|---|---|
| Dec. 2020 | $20,883 | 3.2% | $93,382.06 | $78,132.06 | 83.7% |
| Jan. 2021 | $20,883 | 8.2% | $281,276.17 | $265,150.00 | 94.3% |
| Feb. 2021 | $20,883 | 7.4% | $102,172.76 | $33,559.00 | 32.8% |
| Mar. 2021 | $20,883 | 6.8% | $23,071.10 | $20,700 | 89.7% |
| **Total** | **$83,333** | **5.6%** | **$499,902.09** | **$397,541.06** | **79.5%** |

79.     Palazzo's statements that he intended to use the Dallas Investor Group's funds on developing the Play Caller App were thus materially misleading because a reasonable investor would have wanted to know that their funds were not being used for their intended business purpose.  Indeed, Investor 4 has stated that he would not have invested if he knew Palazzo was using his investment on legal settlements and other personal expenses.

   *ii.   The Second Fraudulent Offering to the Dallas Investor Group.*

80.     In December 2022, the eight notes came due, and Palazzo made lulling statements that not only prevented members of the Dallas Investor Group from complaining about his actions, but also fraudulently convinced all of them to roll their investment forward into new notes.

COMPLAINT                                              23

81.    For instance, on or around November 8, 2022, Investor 4 emailed Palazzo ahead of the notes' maturity date of December 28, 2022.  Investor 4 asked Palazzo for the Play Caller App's status and Play Caller's balance sheets and income statements.

82.    Palazzo responded the next day, attaching income statements and a balance sheet. The income statements showed that Play Caller had $50,966 in total expenses in each month of 2021, with $37,781 spent on "product, technology & team expenses," $2,000 spent on "software & application expenses," and $11,175 on "other product & dev expenses."  The balance sheet showed that Play Caller had $10,409 in cash and cash equivalents in October 2021 and $158,224 in cash and cash equivalents as of December 2021.  These statements were false.

83.    For example, the statement that Play Caller spent only $50,966 in January 2021 was false.  Play Caller spent $235,000 on the 2019 Civil Lawsuit alone in January 2021, and also had other expenses.  The statement that Play Caller spent only $50,966 in July 2021 was similarly false. In July 2021, Palazzo had used another Play Caller investor's funds to pay more than $60,000 in rent and a security deposit for a multi-million-dollar home, currently valued at over $5 million, for him and his family.

84.    Additionally, Play Caller did not have cash and cash equivalents of $10,409 in October 2021 and $158,224 in December 2021.  According to Play Caller's bank records, in October 2021, the company had a beginning balance of $10 in its bank account and an ending balance of $30.  In December 2021, the company had a beginning balance of $18.25 in its bank account and an ending balance of $19.25.  The company had similarly low funds from September through December 2021.

85.    As the sole signatory to the Play Caller bank account, Palazzo had full control and knew Play Caller's expenditures and cash on hand.  His bald-faced falsities were an attempt to cover up his misappropriation of funds.

86.    Palazzo's deception resulted in six of the investors agreeing to roll their notes forward another year while the other two investors rolled their notes forward to February 2023.  All eight extensions were memorialized in amended promissory notes executed by Palazzo, acting on

behalf of Play Caller. These amended promissory notes are also securities for the same reasons as the original notes.

87. Palazzo has not repaid any investors in the Dallas Investor Group any of the principal or interest due on their convertible promissory notes.

### b. Palazzo Defrauded a Former Professional Athlete.

88. Having exhausted the Dallas Investor Group's funds, Palazzo moved on to new targets of opportunity. On or around June 8, 2021, Palazzo sent a Play Caller presentation to a former professional athlete and an employee at a venture capital firm affiliated with the athlete. Approximately one month later, on or around July 16, 2021, Palazzo received a $100,000 investment in Play Caller from the venture capital firm ("Investor 5"). This investment was memorialized in a convertible promissory note with Play Caller and had a maturity date of December 2022.

89. In the presentation, Palazzo represented that Play Caller was "raising capital to execute against specific product development targets for the next 12 months to bring its proprietary engine and games to market through strategic partnerships." This was not true.

90. To the contrary, the very day that Palazzo and Play Caller received Investor 5's funds, Palazzo began transferring money from the Play Caller bank account to NP Ventures' bank account. Then, of the $85,000 in funds transferred to NP Ventures between July 16, 2021, and July 27, 2021, Palazzo spent more than $60,000 on a security deposit and the first three months' rent for his family's new multi-million-dollar rental home. He spent another $8,000 on moving expenses and $5,000 on litigation expenses unrelated to Play Caller. Palazzo transferred the remaining approximately $13,000 of Investor 5's money from a Play Caller bank account to the NP Vent Account. Of those funds, Palazzo spent approximately $9,000 on rent for his previous rental home and $1,200 on credit card payments.

91. In total, Palazzo spent less than $2,500 of Investor 5's money on business expenses of Play Caller. Palazzo has not repaid Investor 5 any of the principal or interest due on its convertible promissory note.

### c. Palazzo Defrauded a Gaming Industry Advisory Firm.

92.     Palazzo's misappropriation of investor funds continued unabated.  On or around February 28, 2022, Palazzo sent a manager of a gaming industry advisory firm a Play Caller presentation.  A few weeks later, on or around March 17, 2022, the gaming industry advisory firm ("Investor 6") invested $100,000 in Play Caller.  Investor 6's investment was memorialized in a convertible promissory note with Play Caller and had a maturity date of February 2023.

93.     In the presentation, Palazzo represented that Play Caller "plans to raise capital to execute specific product development goals, including integration of web3 elements, to bring its platform to market generating revenues through licensing and real-money competitions."  Once again, this was not true.  Instead, Palazzo again misappropriated investor funds to subsidize his lifestyle.

94.     Indeed, shortly after receiving Investor 6's funds, in April 2022, Palazzo spent approximately $10,000 at the Mandalay Bay Resort & Casino in Las Vegas and approximately $4,200 on airfare.  Between March 17 and April 26, 2022, he transferred more than $60,000 to the NP Ventures account.  He used those funds to spend $12,250 on personal rent, more than $5,000 on his children's private school and daycare, and more than $20,000 on other personal expenses, including car payments, dental expenses, and purchases at a pool supply store.  He withdrew another approximately $4,200 in cash and transferred at least $8,800 to the NP Vent Account, which he used primarily for personal expenses.

95.     In total, Palazzo spent less than $20,000 of Investor 6's money on Play Caller's business expenses.  Palazzo has not repaid Investor 6 any of the principal or interest due on its convertible promissory note.

### d. Palazzo Defrauded a Navy Veteran.

96.     Unfortunately, Palazzo also targeted as one of his victims an 89-year-old who served in the United States Navy and other government roles before starting an investing career ("Investor 7").  Between December 2020 and August 2023, Investor 7 sent Palazzo and NP Ventures $500,000 across 12 investments.  Investor 7's investments were memorialized in convertible promissory notes with NP Ventures and had maturity dates between December 6, 2021, and October 31, 2023.

97.     Palazzo testified that he told Investor 7 that his funds would be used to support the continued development of Play Caller.  Documents provided to Investor 7, including a presentation that Palazzo sent Investor 7, indicate that Palazzo solicited money from Investor 7 by referencing both Play Caller and STACK.  For example, in or around August 2020, Palazzo sent Investor 7 a document which states: "NP [Ventures] plans to raise $500,000 ($500k) in seed capital to launch.  Funds will be used to launch the Play Caller/4TA Sports businesses and support the buyback of certain assets of Stack Media, my previous company, that are highly synergistic."  Investor 7 subsequently began investing with Palazzo, sending him $100,000 on December 7, 2020, and ultimately investing approximately $500,000 through a dozen notes between December 2020 and September 2023.  Though Investor 7 may have invested in both the Play Caller and STACK opportunities, Palazzo used little of Investor 7's funds on either investment.  To the contrary, of the $500,000, Palazzo misappropriated at least $450,000 by, for instance, using the funds to pay for multiple vacations, including a trip to Disneyland.  For instance, on or around June 22, 2022, Investor 7 made a $100,000 investment.  Starting the next day, and continuing to around June 27, 2022, Palazzo spent approximately $4,000 during a personal trip to Lake Tahoe.  Palazzo spent at least $5,000 on another personal trip to Hilton Head Island in late July 2022.  Additionally, Palazzo used Investor 7's funds for various other personal expenses, including personal rent, car payments, credit card payments, dental expenses, sports and fitness expenses, his children's daycare and private school expenses, and significant cash withdrawals.

98.     Moreover, throughout 2023, Palazzo made several "lulling" statements to Investor 7 that were designed to both give Investor 7 a false sense of security and operated as new frauds that convinced Investor 7 to invest additional funds.

99.     For instance, on or around April 20, 2023, Palazzo wrote to Investor 7: "Finally, and please know that I am embarrassed to ask and bother you, but I wondered given the timing of the [new] capital coming in next month, if you would be able to help with one final $25k bridge investment to help us get through until their capital arrives?"  Investor 7 provided $25,000 on or around April 21, 2023.  Yet, there is no indication that Palazzo had new capital lined up or was

spending money to develop the Play Caller App. Indeed, Palazzo received no additional capital until he convinced Investor 7 to provide him with another $25,000 on or around May 25, 2023.

100.   Between April and August 2023, Palazzo continued this same pattern of "lulling" statements followed by new fraudulent requests for additional investments. Each time, Investor 7 provided Palazzo and NP Ventures with more funds in exchange for a new promissory note signed by Palazzo on behalf of NP Ventures.

101.   In total, Palazzo and NP Ventures spent less than $55,000 of Investor 7's funds on business expenses. Palazzo has not repaid Investor 7 any of the principal or interest due on his convertible promissory notes. On information and belief, Investor 7 still trusts Palazzo and despite the efforts of the SEC staff to reach out to him, Investor 7 is unaware that he has been defrauded.

### e. Palazzo Defrauded a Senior Care Coordinator.

102.   After years of misleading investors and misappropriating funds, Palazzo's scheme was still continuing in late 2023—even after Palazzo became aware of the SEC's investigation. On or around September 28, 2023, Palazzo orally represented to a senior care coordinator that her investment would be used to market the launch of Play Caller. On or around September 28, 2023, Palazzo received a $100,000 investment from an entity ("Investor 8") that the senior care coordinator formed with a realtor. This investment was memorialized in a convertible promissory note with Play Caller and has a maturity date of September 21, 2024.

103.   Palazzo did not use Investor 8's funds for marketing Play Caller. Indeed, Play Caller did not even launch a version of the App until after Palazzo exhausted Investor 8's funds. Instead, Palazzo spent approximately $46,400 at a San Francisco jeweler, another $9,500 on personal rent, approximately $5,000 on airfare, and more than $9,000 on other personal expenses, including a trip to Hilton Head Island.

104.   In total, Palazzo and Play Caller spent less than $14,000 of Investor 8's funds on any business expenses. Palazzo has not repaid Investor 8 any of the principal or interest due on its convertible promissory note.

105.   Each of the above statements made by Palazzo, in his capacity as CEO and Chairman of NP Ventures and Play Caller, were materially misleading because a reasonable investor would

have wanted to know that Palazzo did not intend to use their funds to develop Play Caller's App but rather to fund his lavish lifestyle, legal settlements, and other personal expenses. And, indeed, several of the Play Caller investors listed above have stated that they would not have invested if they knew their funds would be used for Palazzo's personal expenses.

### 3. Palazzo Misappropriated Play Caller Investor Funds.

106. Between September 2020 and December 2023, Palazzo received approximately $2.1 million to develop his Play Caller business, primarily through convertible promissory notes between investors and Play Caller or NP Ventures. Play Caller and NP Ventures received a limited amount of non-investor funds during that time, including consulting income earned by Palazzo and Palazzo's own funds. Play Caller received approximately $125,000 from non-investor sources, while NP Ventures received approximately $157,000 from non-investor sources.

107. A breakdown of how Palazzo spent the combined Play Caller and NP Ventures investors' funds appears below. For purposes of this chart, to the extent Play Caller and NP Ventures had non-investor sources of funds, the SEC has (favorably to the Defendants) first credited personal expenses against those non-investor funds, and what is shown below is how investor funds were used.

| NP Venture and Play Caller Use of Investor Funds | | |
|---|---|---|
| **Spending Categories** | **Amount** | **Percentage** |
| Undisclosed consulting fees to NP Vent and NP Ventures | $1,094,798.85 | 50.6% |
| Personal expenses | $241,300.64 | 11.1% |
| Unrelated debts and litigation expenses | $421,092.45 | 19.5% |
| *Subtotal of improper use of investor funds* | *$1,757,191.94* | *81.2%* |
| Other expenses | $79,030.94 | 3.7% |
| Potential business expenses | $327,914.35 | 15.1% |
| *Subtotal of use of funds not presently alleged to be improper* | *$406,945.29* | *18.8%* |
| **Total** | **$2,164,137.23** | |

108. Even if the amounts in the chart above are offset by the $83,333 Palazzo misleadingly described as his salary to the Dallas Investor Group, he still misappropriated more than 75% of investor funds.

109.    Because he was the person both making the statements above and misappropriating investor funds, Palazzo knew, or was reckless or negligent in not knowing, that his statements to investors were materially false and misleading.  He also knew, or was reckless or negligent in not knowing, that his misappropriation of funds acted, or would act, as a fraud or deceit upon these same investors.  Because Palazzo was the CEO and controlling shareholder of both Play Caller and NP Ventures, and acted on behalf of Play Caller and/or NP Ventures when signing the promissory notes discussed above, his scienter and negligence is imputed to Play Caller and NP Ventures.  Additionally, because Palazzo managed both Play Caller and NP Ventures on a day-to-day basis, negotiated the promissory notes at issue, and controlled the financial expenditures for both Play Caller and NP Ventures throughout this period, he is a control person within the meaning of Section 20(a) of the Exchange Act.

### 4.    Palazzo Attempted to Paper Over His Fraud Through His Substantial Consulting Payments and Loans to Himself.

110.    As Palazzo kicked off the Play Caller offering, in or around September 2020, Palazzo entered into separate consulting agreements with Play Caller and NP Ventures.  Each agreement was structured to pay entities controlled by Palazzo $20,000 per month in purported "consulting fees" (through NP Vent or NP Ventures).  Palazzo, as the Chairman and CEO of each entity, is the lone signatory on each agreement.  The terms of these agreements provided entities controlled by Palazzo total annual consulting fees of $480,000.  Between 2020 and 2023, Palazzo transferred approximately $1 million in investor funds to himself (through NP Vent or NP Ventures) pursuant to these agreements, which he used primarily for personal expenses, legal settlements, and litigation expenses.  In contrast, Palazzo spent less than $350,000 on developing the Play Caller App.  Palazzo did not disclose the consulting agreements nor the extent of his "compensation" to investors except for the misleading disclosures to the Dallas Investor Group described above in paragraphs 74-75, 77-79, and the misleading disclosure to Investor 6 and others discussed in paragraph 113 below.

111.    On top of consulting fees, Palazzo also paid personal expenses and unrelated debts and litigation expenses directly out of Play Caller and NP Ventures' bank accounts.  Indeed,

Palazzo testified that he paid his personal expenses out of these bank accounts and that, on a monthly basis, he performed a reconciliation allocating each personal expense as either: (1) expense reimbursement, (2) consulting fees, or (3) loans to himself.  At the end of each year, Palazzo papered over his theft of investor funds by executing a note for the amount he had "loaned" himself during the year.  As of January 2024, there were four outstanding notes:  a $170,000 note for 2020, a $145,000 note for 2021, a $210,000 note for 2022, and a $184,000 note for 2023, for a total of $709,000.  Each note has a five-year term, and Palazzo has not made any payments of principal or interest under the notes back to the companies.  Again, Palazzo has acknowledged that he never revealed these "loans" to his investors.

112.    Even if Palazzo was entitled to some salary or consulting fees for his efforts, omitting that he was going to spend more than 80% of investor funds on his salary, personal expenses, unrelated legal settlements, and unrelated legal expenses and a mere 20% of investor funds on engineering and other development expenses rendered the statements he made about using investor funds to develop the Play Caller App materially misleading.  Further, in pitch decks to several investors, including to Investor 5, he made specific representations that the money would not only be used to build the Play Caller App, but that it would be used to execute against a list of specific product development targets.  However, Palazzo spent nearly all of Investor 5's $100,000 investment on consulting fees to entities he controlled, more than 75% of which ultimately went toward Palazzo's personal rent, security deposit, and moving expenses.  Thus, Palazzo's representations to Investor 5 were false and misleading.

113.    Additionally, in pitch decks to Investor 6 and two other investors not individually discussed in this Complaint, Palazzo disclosed projected payroll related expenses, along with projections for millions in revenue, profits, operating income, and expenses.  All these projections were built on the premise that Play Caller would be an operating company with revenue and expenses.  However, from May 22, 2020 to December 31, 2023, Play Caller had no significant source of income or revenue—virtually all of its funds appeared to be investor funds or funds from Palazzo or Palazzo-affiliated entities.  Thus, Palazzo omitting to tell Investor 6 and other investors that he intended to use approximately 80% of their investment on personal and other non-business

expenses and a mere 20% on operating expenses, including investment on engineering and other development expenses rendered his disclosures concerning payroll related expenses materially misleading.

114.    Nor can Palazzo claim that his consulting fees were reasonable, and investors should have contemplated that he would need a salary.  To the contrary, Palazzo's representations to investors through, for instance, payroll projections that he provided in his pitch decks clearly contemplated an operating business, with a growing payroll, devoted to developing the Play Caller App, and not a founder using the overwhelming majority of investor money as his own personal slush fund, which he then used to bankroll his living expenses.

115.    For example, the pitch deck that Palazzo drafted and provided to the Dallas Investor Group prior to their $500,000 investment disclosed that Palazzo would receive a $250,000 salary in 2021, representing approximately 5% of Play Caller's planned expenditures for that year.  However, nowhere in the slide deck or other communications did Palazzo disclose that he would use their investment to settle a civil lawsuit, pay outstanding debts, and on other personal expenses.  In any event, he spent approximately $530,000—including approximately $400,000 from the Dallas Investor Group—on non-business expenses in 2021, which was not only well in excess of Palazzo's disclosed $250,000 salary but represented over 75% percent of Play Caller's actual expenses for 2021.

116.    Given Palazzo's repeated statements to investors that their funds would be used to develop the Play Caller App, his use of $1.7 million on himself or to pay debts and litigation expenses unrelated to Play Caller, and less than $350,000 on developing Play Caller, rendered his statements materially false and misleading.  The consulting agreements and loans were not legitimate payments for business operations, but a cover-up and part of Palazzo's overall deliberate scheme to steal investor funds.

117.    The SEC has recently received information that within the past three months Palazzo may have sought to re-victimize numerous NP Ventures and Play Caller investors by soliciting them to sign amendments to the notes described above in exchange for equity in NP Ventures, and/or Play Caller warrants.  As with the 4TA Sports amendments discussed above, the documents

the SEC has received indicate that Palazzo omitted any mention of his past use of investor funds when soliciting these amendments, and that omission rendered materially misleading Palazzo's statements to the investors such as "I will also be personally guaranteeing any outstanding promissory notes in NP Ventures. it is important that I do all I can to help each investor earn a strong return, while also providing additional security for the notes, especially because we had hoped to pay them back already."  As with the recent solicitations of the 4TA Sports investors, the SEC is continuing to assess these new developments.  However, Palazzo's misleading efforts to have investors sign amendments to their prior agreements, including representations that these amendments are a way for investors to obtain repayment, are part of his scheme to conceal from them his intentional misappropriation of their funds.

118.    In total, across both the STACK Scheme and the Play Caller Scheme, Palazzo, through the Corporate Defendants, received approximately $3,065,000 in investor funds between October 2019 and December 2023.  Palazzo has spent more than $1 million on consulting fees to himself.  He has spent another $1.1 million on unrelated past business debts and litigation expenses and $400,000 on personal expenses beyond the consulting fees to himself.  This misappropriation of investor funds, combined with how Palazzo often misappropriated investor funds immediately after receiving them, demonstrates that these schemes were not legitimate businesses that failed, but intentional schemes by which Palazzo sought to defraud people, including his friends, in order to enrich himself.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder

### (All Defendants)

119.    The SEC re-alleges and incorporates by reference each allegation in paragraphs 1 through 118 above.

120.    As set forth above, the Defendants engaged in two fraudulent schemes—the STACK and Play Caller Schemes—by misappropriating investor money intended for business purposes for Palazzo's own enrichment.  Specifically, Palazzo spent the overwhelming majority of investors'

money on personal expenses such as rent for a multi-million-dollar home, private school tuition, jewelry, and a Disney vacation as well as on undisclosed debts, litigation fees, and other expenses unrelated to the business ventures for which he had solicited the investments. Palazzo then engaged in fraudulent "lulling" statements, which in some instances were designed to prevent and did prevent investors from reporting Palazzo for his conduct and in other instances were designed to and did induce some investors to invest more funds or agree to roll over promissory notes.

121.    As set forth above, Defendants made material misstatements and omitted material facts necessary to make other statements not misleading to investors concerning the Corporate Defendants' financing and use of investor funds. In the STACK Scheme, Palazzo represented to Investors 1, 2, and 3 that he had obtained, or would shortly obtain, $5 million in funding. However, Palazzo knew, or was reckless in not knowing, that he had not secured or would not shortly secure $5 million in funding. Second, in both the STACK and Play Caller Schemes he represented that investor funds would be used for business purposes when he knew he intended to, and subsequently did, use the overwhelming majority of funds for his personal benefit.

122.    Further, because Palazzo was the CEO and controlling shareholder of 4TA Sports, NP Ventures, and Play Caller, and acted on behalf of 4TA Sports, NP Ventures, and Play Caller when making the materially misleading statements and signing the promissory notes and agreements, his scienter is imputed to 4TA Sports, NP Ventures, and Play Caller.

123.    By engaging in the acts and conduct alleged in this Complaint, the Defendants directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, with scienter: (a) employed devices, schemes, or artifices to defraud, (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

124.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)

### (All Defendants)

125.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 118 above.

126.    As set forth above, the Defendants engaged in two fraudulent schemes—the STACK and Play Caller Schemes—to defraud by misappropriating investor money intended for business purposes for Palazzo's own enrichment.  Specifically, Palazzo spent the overwhelming majority of investors' money on personal expenses such as rent for a multi-million-dollar home, private school tuition, jewelry, and a Disney vacation as well as on undisclosed debts, litigation fees, and other expenses unrelated to the business ventures for which he had solicited the investments.  Palazzo then engaged in fraudulent "lulling" statements, which in some instances were designed to prevent and did prevent investors from reporting Palazzo for his conduct and in other instances were designed to and did induce some investors to invest more funds or agree to rollover promissory notes.

127.    As set forth above, Defendants made material misstatements and omitted material facts necessary to make other statements not misleading to investors concerning the Corporate Defendants' financing and use of investor funds.  In the STACK Scheme, Palazzo represented to Investors 1, 2, and 3 that he had obtained, or would shortly obtain, $5 million in funding.  However, Palazzo knew, or was reckless or negligent in not knowing, that he had not secured or would not shortly secure $5 million in funding.  Second, in both the STACK and Play Caller Schemes he represented that investor funds would be used for business purposes when he instead used the overwhelming majority of funds for his personal benefit.

128.    Further, because Palazzo was the CEO and controlling shareholder of 4TA Sports, NP Ventures, and Play Caller, and acted on behalf of 4TA Sports, NP Ventures, and Play Caller when making the materially misleading statements and signing the promissory notes and agreements, his scienter and negligence are imputed to 4TA Sports, NP Ventures, and Play Caller.

129.    By engaging in the conduct described above, the Defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser of the securities offered or sold by the Defendants.

130.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

**Control Person Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder,**

**pursuant to Exchange Act Section 20(a)**

**(Defendant Palazzo)**

131.    The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 118 above.

132.    At all relevant times, Defendant Palazzo was a control person of Defendants 4TA Sports, NP Ventures, and Play Caller, because he possessed, directly or indirectly, and exercised actual control over the operations of 4TA Sports, NP Ventures, and Play Caller.

133.    Specifically, because Palazzo was the CEO and controlling shareholder, managed 4TA Sports on a day-to-day basis, negotiated the notes and investment contracts at issue, and controlled the financial expenditures for 4TA Sports throughout this period, he is thus a control person within the meaning of Section 20(a) of the Exchange Act.

134.    Additionally, because Palazzo was the CEO and controlling shareholder of both Play Caller and NP Ventures, managed both Play Caller and NP Ventures on a day-to-day basis, negotiated the promissory notes at issue, and controlled the financial expenditures for both Play Caller and NP Ventures throughout this period, he is thus a control person within the meaning of Section 20(a) of the Exchange Act.

135.    Palazzo did not act in good faith when he made materially misleading statements to investors and misappropriated investor funds, which he spent on personal expenses such as rent for a multi-million-dollar home, private school tuition, jewelry, and a Disney vacation as well as on undisclosed debts, litigation fees, and other expenses unrelated to the business ventures for which he had solicited the investments.  To the contrary, because he was the person both making the statements above and misappropriating investor funds, Palazzo knew, or was reckless in not knowing, that his statements to investors were materially false and misleading.  He also knew, or was reckless in not knowing, that his misappropriation of funds acted, or would act, as a fraud or deceit upon these same investors

136.    Accordingly, pursuant to Exchange Act Section 20(a), Palazzo is liable to the SEC to the same extent as 4TA Sports, NP Ventures, and Play Caller are liable for their respective violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

### I.

Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

### II.

### <u>Injunction</u>

In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Palazzo, 4TA Sports, NP Ventures, Play Caller and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

**Conduct Based Injunction against Palazzo**

Permanently enjoining Palazzo from directly or indirectly, including, but not limited to, through any entity owned or controlled by Palazzo, participating in the issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

**IV.**

**Disgorgement and Prejudgment Interest**

Ordering Defendants to disgorge on a joint and several basis, and with prejudgment interest, the ill-gotten gains and/or unjust enrichment they received directly or indirectly as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**V.**

**Civil Penalty**

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VI.**

**Officer and Director Bar**

Ordering, in accordance with Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Palazzo is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## VII.

### Further Relief

Granting such other and further relief as the Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors; and

## VIII.

### Retaining Jurisdiction

Retaining jurisdiction of this action for purposes of enforcing any final judgments and orders.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried before a jury.

Respectfully submitted,

Date: September 20, 2024                    /s/ Carina A. Cuellar_____

                                           Carina A. Cuellar
                                           Lauren B. Poper
                                           Brittany K. Frassetto
                                           Attorneys for Plaintiff

*Of Counsel*
Christopher Bruckmann